1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   Equal Employment Opportunity              No. CV-11-01355-PHX-BSB
    Commission,
10                                            **REPORT AND**
                    Plaintiff,                **RECOMMENDATION**
11
    v.
12
    Recession Proof USA LLC, et al.,
13
                    Defendants.
14

15          Plaintiff the Equal Employment Opportunity Commission (EEOC) has filed a

16   motion for default judgment in this case alleging race discrimination and retaliation.[1]

17   (Doc. 47.)  In its First Amended Complaint, the EEOC alleges claims against Defendants

18   Recession Proof USA LLC (Recession Proof), Phillip D. Smith d/b/a Recession Proof

19   USA LLC, Phillip Smith d/b/a Prime Time Marketing Solutions LLC, and Prime Time

20   Marketing Solutions LLC d/b/a/ USA Supreme Technology.[2]  (Doc. 16.)   The First

21   Amended Complaint alleges that Defendants terminated Recession Proof employee

22   Richard Miller for opposing what he reasonably believed was discrimination and that

23   _____

24          [1] The EEOC filed a Complaint on April 23, 2012 (Doc. 1), and filed a First
     Amended Complaint on January 19, 2012.  (Doc. 16.)   The EEOC consented to
25   magistrate judge jurisdiction pursuant to 28 U.S.C. 636(c).  (Doc. 9.)  However, because
     Defendants have not appeared or consented to magistrate judge jurisdiction, the Court
26   proceeds by a Report and Recommendation to the Honorable Stephen M. McNamee.  *See*
     General Order 11-03.

27          [2] The First Amended Complaint also asserted claims against Daniel Brunson d/b/a
     Recession Proof USA LLC.  (Doc. 16.)  The EEOC settled with Brunson and stipulated
28   to the dismissal of its claims against him.  (Docs. 42 and 43.)

they terminated Recession Proof employee Ron Frasso for participating in a proceeding under Title VII, in violation of Section 704(a) of Title VII, 42 U.S.C. §§ 2000e-3(a).[3] (Doc. 16 ¶16-17.)  The EEOC further alleges that Miller was terminated based on his race in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a).[4]  (Doc. 16 ¶ 14.)  The Court has original subject matter jurisdiction over the EEOC's federal claims pursuant to 28 U.S.C. § 1331.

The EEOC properly served Defendants.  (Docs. 32, 33, and 34.)  Based on Defendants' failure to appear or otherwise respond to the Complaint, the Clerk of Court entered default against Defendants.  (Docs. 37 and 46.)  The Court held a hearing on the EEOC's motion for default judgment and, for the reasons set forth below, recommends that default judgment be entered in favor of the EEOC and against Recession Proof USA LLC and Prime Time Marketing Solutions LLC d/b/a USA Supreme Technology.  The Court further recommends that the EEOC's request for default judgment against Defendants Phillip Smith d/b/a Recession Proof USA LLC and Phillip Smith d/b/a Prime Time Marketing Solutions LLC be denied.

## I.    The EEOC's Allegations and Request for Injunctive Relief and Damages

During the relevant time, Recession Proof was an Arizona limited liability company and its members were Daniel Brunson and Phillip Smith.[5]  (Doc. 51, Ex. 1.) Recession Proof helped its clients market their businesses through internet adverstising. (Doc. 16 ¶ 5.)  Miller and Frasso were employees of Recession Proof in April and May 2010.  (Doc. 16 ¶ 12.)  Miller worked for Recession Proof for about two weeks and Frasso worked for Recession Proof for about a month.  (Doc. 51 at 4; Doc. 59 at 72,

---

[3]    The First Amended Complaint refers to § 704(a) of Title VII, the retaliation provision, but erroneously cites that section as 42 U.S.C. § 2000e-2(a).  (Doc. 16 ¶¶ 16, 17.)  The correct citation is 42 U.S.C. § 2000e-3(a).

[4]    The First Amended Complaint also alleged that Defendants subjected Miller and Frasso to a hostile work environment, but the EEOC has withdrawn that claim and the Court will not further consider it.  (*See* Doc. 16 ¶ 18 and Doc. 51 n.3.)

[5]    On September 23, 2011, Recession Proof filed Articles of Termination.  (Doc. 51, Ex. 1; Hearing Ex. 39.)

117.)[6]  Miller and Frasso were part of Recession Proof's sales team and sold advertising to business clients.  (Doc. 51 at 4; Doc. 59 at 62-63.)

The First Amended Complaint alleges that in April 2010, Defendants terminated Miller based on his race, and for "opposing what he reasonably believed was discrimination including, but not limited to opposition to Brunson's use of the 'N' word in the workplace."  (Doc. 16 ¶¶ 14 and 16.)   The First Amended Complaint further alleges that in May 2010, Defendants terminated Frasso for participating in an interview during the EEOC investigation of Miller's charge of discrimination.  (Doc. 16 ¶ 17.)  In its motion for default judgment and during the default damages hearing, the EEOC provided evidence of the following alleged unlawful conduct.

On April 22, 2010, a meeting occurred between Miller, his supervisor Doug Rice, and Recession Proof's co-owner Brunson regarding a large advertising sale that Miller had made.  (Doc. 51 at 4; Doc. 59 at 16, 23.)[7]  During that meeting, Brunson, a Caucasian, congratulated Rice and Miller, who are both African-American, stating, "my nigga — high five."  Miller refused to "high five" Brunson.  (Doc. 51 at 4; Doc. 59 at 23, 73.)  After the meeting, Miller approached Rice and told him that it was inappropriate for Brunson to use the "N" word.  Several hours later when Miller was driving home from work, he received a text message from Brunson stating:

> Like u can't say it to my . . . face like a man.  U got a problem with me using the n word u confront me like a big ass 6ft tall Man that u are.  I don't wanna listen to you and Doug talk right in front of me like I'm not even there.  And then u top it off and say "don't tell him I said that either."  I can tell we are gonna bump a lot of heads working together.  Say it to my face!!!!!

(Doc. 51 at 5; Doc. 59 at 75-78.)

---

[6] Docket 51 is the EEOC's Memorandum in Support of Motion for Judgment by Default.  The exhibits to the memorandum appear on CM/ECF as attachments 1, 2 and 3 to Docket 51.  Attachment 1 contains exhibits 1, 2, and 3; attachment 2 contains exhibit 4; and attachment 3 contains exhibits 5-12.

[7] The transcript of the default damages hearing is at Docket 59.

1   Miller responded, "Be right there!!!!!!! I was there!  No disrespect but I found that

2   to be very disrespectful to use tha[t] word!"  (Doc. 51 at 5; Doc. 59 at 79.)  Brunson

3   replied, "I can tell we are gonna (sic) have issues and I don't want any issues in my life.

4   Ur (sic) check will be ready next Friday u (sic) wrote the business ill (sic) pay you for it."

5   (Doc. 51 at 5; Doc. 59 at 80.)  Miller understood the message to mean that he had been

6   fired.  Miller attempted to return to work to talk to Brunson, but Rice blocked his return

7   to the office and told Miller not to come back to work.  (Doc. 51 at 5; Doc. 59 at 80.)

8   On April 26, 2010, Miller filed a charge of discrimination with the EEOC.  On

9   May 6, 2010, EEOC investigators went to Recession Proof's office to serve the Notice of

10   Charge of Discrimination and to conduct interviews.  (Doc. 59 at 37, 41.)  The EEOC

11   investigators informed Brunson and Rice that participating in the interviews was

12   considered a "protected activity."  (Doc. 59 at 46.)  The investigators interviewed Frasso.

13   Rice and Brunson were present during the interview and intermittently questioned

14   Frasso's responses to some of the investigators' questions.  (Doc. 51 at 5; Doc. 59 at 44,

15   122-23.)  Approximately thirty minutes after that interview, Rice and Brunson

16   reprimanded Frasso and terminated his employment.  (Doc. 51 at 5; Doc. 59 at 45-46,

17   123.)

## II.   Standards for the Entry of Default Judgment

19   Federal Rule of Civil Procedure 55(a) provides that "[w]hen a party against whom

20   a judgment for affirmative relief is sought has failed to plead or otherwise defend as

21   provided by these rules . . . the clerk shall enter the party's default."  After a default has

22   been entered and the defendant fails to appear or move to set aside the default, the court

23   may, on the plaintiff's motion, enter a default judgment.  Fed. R. Civ. P. 55(b)(2).  Here,

24   the Clerk of Court has entered Defendants' default.  Thus, the Court may consider the

25   EEOC's request for default judgment.

26   Once default is entered, the well-pleaded factual allegations in the complaint are

27   taken as true, except for those relating to the amount of damages.  *TeleVideo Sys., Inc. v.*

28   *Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987).  However, "necessary facts not

contained in the pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir.1992) (citing *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir.1978)); *see also DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007) (for default judgment purposes, a defendant is not held to admit facts that are not well-pled or conclusions of law).  The court must consider whether the alleged facts state a claim for relief.  10A Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 3d § 2688, at 63 (1998) (the court must "consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law").

Granting default judgment is within the court's discretion.  *See Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980) (considering lack of merit in plaintiff's substantive claims, the court did not abuse its discretion in declining to enter a default judgment). When deciding whether to grant default judgment, the court considers the following "*Eitel*" factors: (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.  *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

As set forth below, the Court has applied the *Eitel* factors to the EEOC's motion for entry of default judgment, its supporting memorandum, and the testimony and evidence presented at the default damages hearing, and recommends that default judgment be entered against Recession Proof USA LLC and Prime Time Marketing Solutions LLC d/b/a USA Supreme Technology.  The Court further recommends that Plaintiff's motion for default judgment against Defendants Phillip Smith d/b/a Recession Proof USA LLC and Phillip Smith d/b/a Prime Time Marketing Solutions LLC be denied.

### A.      The First, Fourth, Fifth, Sixth, and Seventh *Eitel* Factors

The first, sixth, and seventh *Eitel* factors weigh in favor of default judgment in this case.  The first *Eitel* factor considers whether the claimants on whose behalf the EEOC brings this action will suffer prejudice if default judgment is not entered.  *Pepsico, Inc. v. Cal. Sec. Cans*., 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).  Defendants have failed to appear or otherwise defend this action.  In the absence of a default judgment, the claimants "would be without other recourse for recovery," to which they are entitled.  *See Philip Morris*, 219 F.R.D. at 499.

The sixth *Eitel* factor considers whether the default was due to excusable neglect. There is no evidence that Defendants' failure to appear or otherwise defend was the result of excusable neglect.  Rather, the record reflects that Defendants failed to appear after being served with the First Amended Complaint.  Thus, the sixth *Eitel* factor weighs in favor of default judgment.

Under the seventh *Eitel* factor, the Court considers the policy that, whenever possible, cases should be tried on the merits.  *Id*. at 1472.  The existence of Rule 55(b), however, indicates that the preference for resolving cases on the merits is not absolute. *PepsiCo, Inc*., 238 F. Supp. 2d. at 1177.  Because Defendants have not appeared or responded in this action, deciding this case on the merits is "impractical," if not impossible. *Id.*  Thus, the seventh *Eitel* factor weighs in favor of default judgment.

The fourth and fifth *Eitel* factors are neutral in this case. The fourth *Eitel* factor balances the amount of money at stake in relation to the seriousness of the defendant's conduct.  *Eitel*, 782 F.2d at 1471-72.  Here, the EEOC seeks injunctive relief to prevent future discrimination.  The EEOC also seeks monetary damages totaling $259,710.90 for Miller and Frasso.  Although this is a sizeable amount, considering the seriousness of the allegations and the need to deter such behavior in the future, the amount at stake is not necessarily excessive.  Thus, the fourth factor is neutral.

The fifth *Eitel* factor considers the possibility that material facts may be in dispute. *Eitel*, 782 F.2d at 1471-72.  Because Defendants have failed to respond in this action, and

1  thus have not asserted that there are material facts in dispute, the Court cannot adequately

2  weigh this factor.  Thus, this factor is neutral.

3  **B.    The Second and Third *Eitel* Factors Applied to Plaintiff's Claims Against Recession Proof**

4  The second and third *Eitel* factors consider the merits of the plaintiff's claims and

5  the sufficiency of the complaint.  As set forth below, the EEOC has sufficiently pleaded

6  that Recession Proof terminated Miller and Frasso for engaging in protected activity and

7  also terminated Miller based on his race.  Thus, the First Amended Complaint sufficiently

8  alleges retaliation and discrimination.

9  **1.    Retaliation**

10  The EEOC alleges retaliation in violation of Title VII of the Civil Rights Act of

11  1964, 42 U.S.C. § 2000e-3(a).  Title VII makes it unlawful for an employer to

12  discriminate against an individual because he "has opposed any practice made an

13  unlawful employment practice" by Title VII, or because "he has made a charge, testified,

14  assisted, or participated in any manner in an investigation, proceeding, or hearing" under

15  Title VII.  42 U.S.C. § 2000e-3(a).  This provision has two components: an opposition

16  clause and a participation clause.  The participation clause is "broadly construed."

17  *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988) ("The participation clause

18  is broadly construed to protect employees who utilize the tools provided by Congress to

19  protect their rights.").

20  To establish a prima facie case of retaliation in violation of Title VII, a plaintiff

21  must show that: (1) he engaged in a protected activity; (2) his employer subjected him to

22  an adverse employment action; and (3) there is a causal connection between the protected

23  activity and the adverse action.[8]  *Vasquez v. Cnty of Los Angeles*, 349 F.3d 634, 646 (9th

24

_____

25  [8] Once the plaintiff establishes a prima facie case, the burden of production shifts

26  to the defendant to articulate some legitimate, non-retaliatory reason for the adverse action.  *Gunther v. Cnty of Wash.*, 623 F.2d 1303, 1314 (9th Cir. 1979).  If the defendant

27  meets this burden, the plaintiff must show that the asserted reason was a pretext for retaliation.  *Id.*  In determining whether to enter a default judgment, the Court need only

28  consider whether Plaintiff establishes a prima facie case because Defendants have not appeared to offer any explanation for Miller's and Frasso's terminations.

Cir. 2003).  "To show the requisite causal link, the plaintiff must present sufficient evidence to raise the inference that [the] protected activity was the likely reason for the adverse action."  *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).

Additionally, Title VII liability is premised upon "some connection with an employment relationship."  *Lutcher v. Musicians Union Local 47*, 633 F.2d 880, 883 (9th Cir. 1980).  With limited exceptions related primarily to prospective employers and applicants for employment, the employer charged with discrimination under Title VII must have been the plaintiff's employer at the time of the alleged discrimination for plaintiff to prevail.  *See City of L.A. v. Manhart*, 435 U.S. 702, 718 n.33 (1978) (stating that Title VII "primarily govern[s] relations between employees and their employer, not between employees and third parties").

Here, based on Defendants' default, there is no dispute that Recession Proof met the statutory definition of employer under 42 U.S.C. § 2000e(b), and that Recession Proof was Miller's and Frasso's employer.  (Doc. 16 ¶¶ 5-8, 12.)  There is also no dispute that Miller engaged in protected activity by opposing Brunson's use of the "N" word, and that he was terminated for opposing what he reasonably believed was discrimination.  (Doc. 16 ¶ 16.)  During the default damages hearing, Miller testified that shortly after he complained to his supervisor Rice about Brunson's use of the "N" word, Brunson sent Miller a text message challenging him to complain face-to-face.  (Doc. 59 at 74, 78.)  That same day, as part of the same string of text messages, Brunson terminated Miller.  (Doc. 59 at 79-80.)  Smith later approved Miller's termination after Brunson advised him of the incident.  (Doc. 59 at 23-24.)  Considering the short period of time between the protected conduct and the adverse action, there is sufficient evidence to raise an inference that Miller's protected conduct — opposing the use of the "N" word — was the reason for his termination.  *See Miller v. Fairchild Indus.*, *Inc.*, 885 F.2d 498, 505 (9th Cir. 1988) (stating that a jury could find retaliation when the adverse action occurred within forty-two days of the protected conduct for one plaintiff and within fifty-nine days for the second plaintiff).

Frasso also engaged in protected activity by participating as a witness during the EEOC's investigation of Miller's charge of discrimination. *See Crawford v. Metro. Gov't of Nashville and Davidson Cnty, Tenn.,* 555 U.S. 271, 278-280 (the anti-retaliation provision 42 U.S.C. § 2000e-3(a) is meant to prevent harm to employees who report discriminatory employment practices or assist in the investigation of these practices). Almost immediately after Frasso participated in the EEOC investigation, he was reprimanded and terminated. (Doc. 16 ¶ 17, Doc. 59 at 122-23.) Considering the short period of time between the protected conduct and the adverse action, there is sufficient evidence to raise an inference that Frasso was likely terminated in retaliation for engaging in protected conduct. *See id.*

The EEOC has sufficiently pleaded that Recession Proof was Miller's and Frasso's employer. The EEOC has also sufficiently pleaded that Miller was terminated for opposing what he reasonably believed was discrimination in violation of 42 U.S.C. § 2000e-3(a), and that Frasso was terminated for participating in an EEOC investigation in violation 42 U.S.C. § 2000e-3(a). Accordingly, the second and third *Eitel* factors favor entry of default judgment against Recession Proof on the EEOC's retaliation claims.

## 2.      Racially-Motivated Termination

The First Amended Complaint also alleges that Defendants terminated Miller's employment based on his race, African-American, in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a). (Doc. 16 ¶ 14.) Title VII prohibits employers from failing or refusing to hire or discharging "any individual . . . because of such individual's . . . race . . . ." *Id.* § 2000e–2(a)(1). A Title VII plaintiff carries the initial burden of "establishing a prima facie case of racial discrimination." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "The prima facie case may be based either on a presumption arising from the factors such as those set forth in *McDonnell Douglas*,[9] or

---

[9] Applying the *McDonnell-Douglas* factors in the context of discriminatory termination, a plaintiff must show: (1) that he was member of a protected class; (2) he was adequately performing his job; and (3) that his employer sought a replacement with similar qualifications to his own, thus showing a continued need for the same skills. *Sengupta v. Morrison-Knudsen Co.*, 804 F.2d 1072, 1075 (9th Cir.1986).

by more direct evidence of discriminatory intent." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

Here, the First Amended Complaint alleges that Miller was terminated on the basis of his race, African-American.  (Doc. 16 ¶ 14.)  The First Amended Complaint alleges that a Recession Proof supervisor referred to Miller by using a racial epithet, the "N" word, and that Miller was terminated after objecting to that term.  The use of "N" word is sufficient evidence of racial animus.  *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029 n.7 (9th Cir. 2006) ("[A] plaintiff could offer direct evidence of an employer's discriminatory intent, for example an employer's use of a racial epithet."). Thus, the EEOC has sufficiently pleaded that Miller was terminated based on his race in violation of 42 U.S.C. § 2000e-2(a).  Accordingly, the second and third *Eitel* factors favor entry of default judgment against Recession Proof on the EEOC's claim of discriminatory termination.

### C.   The Second and Third *Eitel* Factors Applied to Plaintiff's Claims Against Smith and the Other Remaining Defendants

In addition to its claims against Recession Proof, the EEOC argues that Phillip Smith, and entities with which he is affiliated, are also liable for the discrimination and retaliation directed at Miller and Frasso at Recession Proof.  The EEOC argues that Smith is liable as a member of Recession Proof through alter ego/veil piercing, as a joint employer with Recession Proof through Prime Time Marketing Solutions LLC, and as a sole proprietor of USA Supreme Technology.  Under the second and third *Eitel* factors, the Court must consider the merits of the EEOC's claims against these Defendants and the sufficiency of the First Amended Complaint.

### 1.   Smith's Alter Ego Liability for Recession Proof

The EEOC asserts that the Court should "pierce the corporate veil" as to Recession Proof, a limited liability company, and hold one of its members, Phillip Smith, personally liable.  (Doc. 51 at 9, Doc. 59 at 147.)  The EEOC argues that Recession Proof

was a "sham," that it was undercapitalized, and that Smith "was Recession Proof in that he bankrolled it." (Doc. 59 at 146.) Under the second and third *Eitel* factors, the Court will consider whether the First Amended Complaint sufficiently alleges that the limited liability company veil should be pierced. *Eitel*, 782 F.2d at 1471.

### a.    Choice of Law — Alter Ego/Veil Piercing Doctrine

"'[I]n determining whether alter ego liability applies, [federal courts] apply the law of the forum state.'"[10] *Sandpiper Resorts Development Corp. v. Global Realty Invs., LLC*, 2012 WL 3234242, at *6 (D. Ariz. Aug. 6, 2012) (quoting *In re Schwarzkopf*, 626 F.3d 1032, 1037 (9th Cir. 2010)); *see also Towe Antique Ford Found. v. IRS*, 999 F.2d 1387, 1390 (9th Cir. 1993) (applying Montana law to determine whether "reverse piercing" of the corporate veil was appropriate in a wrongful levy action under 26 U.S.C. § 7426).

Under Arizona law, it is not established that veil piercing can be used in the context of a limited liability company. *Sandpiper Resorts*, 2012 WL 3234242, at *6. However, in another case in this district, the court concluded "that the rationale behind piercing the veil of a corporation would also apply to an LLC given the similar liability shields that are provided by corporations and LLCs to their respective owners." *Great*

---

[10] *But see Viera v. Chehaiber*, 2010 WL 960347, at *3 (C.D. Cal. Mar. 16, 2010) (stating that because jurisdiction was based on a federal question, the Truth in Lending Act, the Home Ownership and Equity Protection Act, and the Real Estate Settlement Procedures Acts, federal common law controlled the issue of piercing the corporate veil and noting that the Ninth Circuit has a rigorous standard for piercing the corporate veil (quoting Stephen B. Presser, *Piercing the Corporate Veil* 3-114 to -15 (1999))).

Under Ninth Circuit law, it is appropriate to pierce the corporate veil when (1) "there is such a unity of interest and ownership between the corporation and the shareholder that the two no longer exist as separate entities," *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1111 (9th Cir.1979), (2) "failure to disregard the corporation would result in fraud or injustice," *id.*, and (3) either the incorporators of the corporation formed the corporation with fraudulent intent or the corporate form was fraudulently misused following incorporation, or both. *See Board of Trs, v. Valley Cabinet & Mfg. Co.*, 877 F.2d 769, 773–774 (9th Cir. 1989). Because of the similarity between Arizona and Ninth Circuit law on alter ego liability, and in the absence of Ninth Circuit law clarifying whether federal law or the law of a the forum governs the issue of alter ego/veil piercing in the context of a Title VII case, the Court will apply Arizona law. The EEOC addressed its alter ego/veil piercing argument under Arizona law.

*Am. Duck Races v. Intellectual Solutions, Inc.*, 2013 WL 1092990, at *3 (D. Ariz. Mar. 15, 2013) (citing *NetsJets Aviation, Inc. v. LHC*, 537 F.3d 168 (2d Cir. 2008) (applying the principles of corporate veil piercing to LLCs under Delaware law and noting that emerging case law illustrates that LLC veil piercing and corporate veil piercing are similar)).

Under Arizona law "[a] corporate entity will be disregarded, and the corporate veil pierced, only if there is sufficient evidence that: (1) the corporation is the alter ego or business conduit of a person; and (2) disregarding the corporation's separate legal status is necessary to prevent injustice." *Loiselle v. Casa Mgmt Group, LLC* 228 P.3d 943, 950 (Ariz. Ct. App. 2010). In Arizona, "alter-ego status . . . exists when there is such a unity of interest and ownership that the separate personalities of the corporation and owners cease to exist." *Dietel v. Day*, 492 P.2d 455, 457 (Ariz. Ct. App. 1972). Relevant factors include: payment of salaries and expenses of the corporation by shareholders; failure to maintain corporate formalities; undercapitalization; commingling of corporate and personal finances; plaintiff's lack of knowledge about a separate corporate existence; owners making interest free loans to the corporation; and diversion of corporate property for personal use. *Great Am.*, 2013 WL at 1092990, at *2 (citing *Deutsche Credit Corp. v. Case Power & Equip. Co.*, 876 P.2d 1190, 1195 (Ariz. Ct. App. 1994)).

### b.        Rule 8(a) — Pleading Alter Ego/Veil Piercing

The Federal Rules of Civil Procedure require "only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also* Fed. R. Civ. P. 8(a)(2). Thus, a complaint is insufficient if it fails to state a claim on its face. *Lucas v. Bechtel Corp.*, 633 F.2d 757, 759 (9th Cir.1980); *see also* Fed. R. Civ. P. 12(b)(6). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle [ment] to relief' requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted).

"In alleging alter ego liability under the pleading standard of Rule 8(a), the plaintiff must do more that make conclusory statements regarding an alter ego relationship between individual and corporate defendants; the plaintiff must allege specific facts supporting application of the alter ego doctrine." *See Barba v. Seung Heun Lee*, 2009 WL 8747368, at *4 (D. Ariz. Nov. 4, 2009) (comparing *Skydive Ariz., Inc. v. Quattrochi*, 2006 WL 2460595, at *7–8 (D. Ariz. Aug. 22, 2006) (finding plaintiff failed to state a claim against defendants because the complaint simply alleged the alter ego theory with no factual basis), with *Whitney v. Wurtz*, 2006 WL 83119, at *2 (N.D. Cal. Jan. 11, 2006) (finding complaint established a cognizable alter ego theory by alleging individual defendants "used assets of the corporation for their personal use," "controlled, dominated and operated" corporation "as their individual business and alter ego" without "holding of director's or shareholder's meetings," and "caused monies to be withdrawn from the funds of defendant corporation and distributed to themselves without any consideration to the corporation")).

In the caption of the First Amended Complaint, the EEOC names "Recession Proof USA LLC" and "Phillip D. Smith d/b/a Recession Proof USA LLC" as Defendants. The "doing business as" designation suggests that the EEOC is suing Smith in his individual capacity, but "it is a legal conclusion, . . . and [the EEOC] cannot simply collapse [Recession Proof into Phillip Smith] without alleging at least 'a few facts which outline [its] claim.'" *See Lachmund v. ADM Investor Servs., Inc.*, 26 F. Supp. 2d 1107, 1113 (N.D. Ind. 1998). The First Amended Complaint does not contain *any* allegations regarding the alter ego relationship between Smith and Recession Proof. The First Amended Complaint merely names Smith as a party doing business as Recession Proof USA LLC. (Doc. 16 at 1.) None of the allegations refer to Recession Proof as Smith's alter ego. There are no allegations that Smith treated Recession Proof's assets as his own, that he commingled funds with Recession Proof, or that Recession Proof was

undercapitalized.  Without such allegations, the issue of alter ego/veil piercing was not sufficiently pleaded.  *See Coeur D'Alene Tribe v. Asarco Inc*, 2009 WL 3402365, at *5-6 (D. Idaho 2000) (noting that under Ninth Circuit law corporate veil piercing is a means of imposing liability and that complaint did not satisfy the notice pleading requirements for asserting a veil piercing theory); *Kingsburg Apple Packers Inc. v. Ballantine Produce Co.*, 2010 WL 2817056, at *5 (E.D. Cal. Jul. 16, 2010) (finding complaint insufficient to plead an alter ego relationship because allegations were conclusory and merely recited the factors that a court considers in evaluating an alter ego claim); *China Eastern Airlines v. Yang*, 2004 WL 5645595, at *5 (C.D. Cal. Nov. 15, 2004) (denying application for default judgment against individual defendant when complaint contained only conclusory allegations that business entity was individual defendant's alter ego).

In the memorandum in support of its Motion for Default Judgment and during the default damages hearing, the EEOC presented additional allegations and evidence regarding its alter ego/veil piercing theory.  (Docs. 51 and 59.)  Although the Court is mindful that the EEOC's ability to develop the facts underlying this theory was impeded by Defendants' default, the EEOC does not explain why it failed to include *any* factual allegations relevant to its alter ego/veil piercing theory in its First Amended Complaint. The EEOC apparently developed this additional information — without discovery from Defendants — through Miller, Frasso, and its own investigation.

The Ninth Circuit recognizes that "[a] request to pierce the corporate veil is only a means of imposing liability for an underlying cause of action and it not a cause of action itself."  *Local 159, 342, 343, & 444 v. Nor-Cal Plumbing*, 185 F.3d 978, 985 (9th Cir. 1999) (citation omitted).  Nonetheless, because a plaintiff must allege "those facts necessary to a finding of liability," a plaintiff seeking to impose liability on an individual based on an alter ego/veil piercing theory must include such allegations in the complaint.[11]  *See Barba*, 2009 WL 874368, at *5 (denying Rule 12(b)(6) motion to

---

[11] Arizona courts do not appear to have specifically addressed whether an alter ego claim is a separate cause of action under Arizona law.  *See Five Points Hotel P'ship v. Pinsonneault*, 835 F. Supp. 2d 753, 760 (D. Ariz. 2011) (discussing cases).  However, as

1   dismiss finding that plaintiff sufficiently pleaded the corporate veil piercing doctrine

2   under Arizona law based on allegations in the complaint that individual defendant used

3   corporate assets for his personal use, intermingled assets and employees between various

4   corporations, did not hold shareholder meetings, and transferred corporate funds without

5   adequate consideration).

6        Courts within the Ninth Circuit have discussed the sufficiency of a plaintiff's

7   allegations supporting the alter ego/veil piercing doctrine in various contexts. *See*

8   *F.D.I.C. v. Quest F.S., Inc.* 2011 WL 2560428, at *3 n.3 (C.D. Cal. Jun. 27, 2011) (on

9   default judgment individual defendants could be held liable for breach of contract

10  because the complaint sufficiently pleaded their alter ego status); *Woodard v. Delportas*,

11  2008 WL 5082186, at *1 (D. Ariz. Nov. 26, 2008) (entering default judgment against

12  individual and corporate defendants when complaint alleged corporate veil piercing/alter

13  ego); *In re Don's Making Money, LLP*, 2007 BR 2784351, at *2 (Bkrtcy. D. Ariz. Sept.

14  24, 2007) (chapter 7 Trustee asserted a claim of "alter ego/piercing the corporate veil" in

15

16  the court in *Five Points Hotel* noted, dicta from several Arizona cases suggests that an
    alter ego/veil piercing theory may be an independent claim. *Id.* (citing *Chalpin v. Snyder*,
17  207 P.3d 666, 670 (Ariz. Ct. App. 2008) ("The trial court, however, allowed Reliance to
    take its claims of fraud and alter-ego to a jury. Ultimately, Reliance did not request a jury
18  instruction for its alter-ego claim."); *GM Dev. Corp. v. Cmty. Am. Mortg. Corp.*, 795 P.2d
    827, 835 (Ariz. Ct. App.1990) ("In the case before us, the complaint contained four
19  counts . . . Count I alleged that [ ] was responsible for the debt owed by [ ] and [ ]
    pursuant to an alter ego theory of liability . . . Clearly, the breach of contract claim
20  requires proof of different facts than would be required for the fraud, racketeering, and
    alter ego claims.")).  Relying on those cases, the court in *Five Points Hotel* "assume[d]
21  that Arizona recognizes the alter ego theory as a claim that can stand alone."  *Five Points
    Hotel*, 835 F. Supp. 2d at 760.
22
23       On the other hand, at least one court within this district discussing the alter ego
    doctrine under Arizona law has stated that the doctrine of veil piercing "is not a cause of
24  action in itself.  Rather, it is a means to vindicate the interests of the parties injured
    through a breach of contract or a tort." *In re Elegant Custom Homes, Inc.*, 2007 WL
25  14124556, *5 (D. Ariz. May 14, 2007) (citing *Int'l Fin. Servs. Corp. v. Chromas Tech.
    Canada, Inc.*, 356 F.3d 731, 735-36 (7th Cir. 2004) ("Piercing the corporate veil, after all
26  is not itself an action; it is merely a procedural means of allowing liability on a
    substantive claim[.]"))

27       Nevertheless, even if veil piercing is not an independent claim, the case law
28  supports applying Rule 8(a)'s pleading requirements to an assertion of that doctrine as a
    theory of liability.  (See Section II(C)(1)(b) at page 15 (discussing cases).)

1    an action to collect a default judgment); *Wady v. Provident Life and Accident Ins. Co. of*

2    *Am.*, 216 F. Supp. 2d 1060 (C.D. Cal. Apr. 30, 2002) (granting summary judgment

3    because complaint did not put defendant on notice of alter ego theory and granting leave

4    to amend to allege alter ego theory would be futile).[12]

5        Here, the First Amended Complaint did not include any allegations regarding the

6    EEOC's alter ego/veil piercing theory of liability against Smith and thus was insufficient

7    to establish such liability.   Although the EEOC might argue that it should be granted

8    leave to further amend its First Amended Complaint, the Court concludes in its discretion

9    that amendment would be untimely and would prolong completion of a case that has

10    proceeded to the judgment stage.   Accordingly, the second and third *Eitel* factors weigh

11    against entering default judgment against Phillip D. Smith d/b/a Recession Proof USA

12    LLC on an alter ego/veil piercing theory of liability.

13              **2.**      **Smith's Joint Employer Liability**

14        The EEOC also argues that "Phillip D. Smith d/b/a Recession Proof USA LLC,"

15    "Phillip D. Smith d/b/a Prime Time Marketing Solutions LLC," and "Prime Time

16    Marketing Solutions LLC d/b/a USA Supreme Technology" were joint employers of

17    Miller and Frasso with Recession Proof.  The EEOC submitted exhibits from the Arizona

18    Corporation Commission indicating that Recession Proof USA LLC was a limited

19    liability company and that its members were Daniel Brunson and Phillip D. Smith.

20    (Doc. 51, Ex. 1.)   The EEOC also submitted evidence that Prime Time Marketing

21    Solutions LLC was a limited liability company, with Smith as its managing member.

22

23    [12] Courts outside the Ninth Circuit have also found that when a party seeks to pierce the limited liability company veil, the company must be named in the complaint,

24    the complaint should give adequate notice of the veil-piercing theory against the LLC, and the complaint must allege facts sufficient to pierce the veil of the LLC.  *See Rual*

25    *Trade Ltd. v. Viva Trade LLC*, 549 F. Supp. 2d 1067 (E.D. Wis. 2008); *Flentye v. Kathrein*, 485 F. Supp. 2d 903 (N.D. Ill. 2007) (complaint sufficiently alleged a veil

26    piercing claim when it named Kathrein as a party doing business as Lee Street Management and alleged that defendant Lee devised the Kathrein LLC for the sole

27    purpose of holding title to real estate through which he operated Lee Street Management). When the complaint is insufficient, however, the veil of the limited liability company will

28    not be pierced.  *Sudamax Industria e Comerico de Cigarros, Ltda v. Buttes & Ashes, Inc.*, 516 F. Supp. 2d 841 (W.D. Ky. 2007).

(Doc. 51, Ex. 3.)  By alleging that Smith was "doing business as" Recession Proof USA LLC and Prime Time Marketing Solutions LLC, and by offering evidence that these entities were LLCs, it appears that the EEOC sued Smith "d/b/a" these LLCs in an effort to hold Smith liable in his personal capacity, not as a member of these LLCs.  Indeed the EEOC does not allege that a member of an LLC can be held liable as a joint employer with the LLC in the context of Title VII.  Thus, it appears that the EEOC's allegations that Smith, doing business as various entities, was a "joint employer" with Recession Proof are simply another attempt to pierce the LLC veil of these entities (Recession Proof USA LLC and Prime Time Marketing Solutions LLC) and impose alter ego liability on Smith.

As set forth above in Section II(C)(1)(b), the First Amended Complaint does not contain *any* allegations regarding the EEOC's alter ego/veil piercing theory of liability against Smith as a member of Recession Proof USA LLC.   The First Amended Complaint also does not contain *any* allegations to establish an alter ego/veil piercing theory of liability against Smith as a member of Prime Time Marketing Solutions LLC. Therefore, because the First Amended Complaint is insufficient to establish Smith's liability in his personal capacity for the actions of these entities, the Court will only consider whether Recession Proof USA LLC and Prime Time Marketing Solutions LLC d/b/a USA Supreme Technology are liable as joint employers for the discriminatory conduct directed at Miller and Frasso.

### 3.   Joint Employer Liability of the Remaining Defendants

As set forth in Section II(B)(1), Title VII liability is premised upon "some connection with an employment relationship."  *Lutcher*, 633 F.2d at 883.  To be subject to liability under Title VII, a defendant must qualify as an "employer" under the statute.[13]

---

[13] Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . . ." 42 U.S.C. § 2000e(b).  Here, the First Amended Complaint sufficiently alleges that each Defendant satisfies the statutory criteria of an employer under Title VII.  (Doc. 16 at ¶¶ 6-8.)

However, "[a] direct employment relationship is not a prerequisite to Title VII liability. Although 'there must be some connection with an employment relationship for Title VII protections to apply,' that 'connection with employment need not necessarily be direct.'" *Ass'n of Mexican–Am. Educators v. California*, 231 F.3d 572, 580 (9th Cir.2000) (quoting *Lutcher*, 633 F.2d at 883). The Ninth Circuit has recognized several legal theories under which the conduct of an entity that is not an employee's direct employer could nonetheless result in Title VII liability, including the "joint employer" theory of liability. *See DaOro v. Eskaton*, 2013 WL 789120, at *4-6 (E.D. Cal. Mar. 1, 2013) (analyzing whether defendant could be considered a joint employer for purposes of Title VII); *EEOC v. Global Horizons, Inc.*, 860 F. Supp. 2d 1172, 1183 (D. Hawaii Mar. 16, 2012) (citing *Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924, 930 (9th Cir. 2003)) (same).

To determine whether a joint employment relationship exists, the Ninth Circuit uses an "economic realities test" that takes into account various factors including: "whether the alleged joint employer (1) supervised the employee, (2) had the power to hire and fire him, and (3) had the power to discipline him, and (4) supervised, monitored and/or controlled the employee and his work site." *Global Horizons*, 860 F. Supp. 2d. at 1183 (citing *Pac. Mar. Ass'n*, 336 F.3d at 930. Even when two entities are deemed a joint employer, they are not necessarily both liable for the discriminatory conduct. Rather, the "'plaintiff must still show that the joint employer knew or should have known of the discriminatory conduct and failed to take corrective measures within its control.'" *Global Horizons*, 860 F. Supp. 2d at 1184 (quoting *Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009)).

It is not clear, however, whether the joint employer theory of liability remains viable in the Title VII context because the Ninth Circuit effectively withdrew *Anderson v. Pacific Maritime,* its only opinion applying this standard in a Title VII case. *See Brown v. Arizona*, 2011 WL 2911054, at *3 n.2 (D. Ariz. Jul. 20, 2011) (discussing procedural history of *Pacific Maritime*). As explained in *Brown,* the Ninth Circuit granted a rehearing in *Pacific Maritime*, but the parties stipulated to a dismissal before the

1    rehearing took place.  The "Ninth Circuit, however, never vacated its prior order or

2    reinstated the opinion of the three panel judge." *Id.*  Thus, the court in *Brown* considered

3    *Pacific Maritime* persuasive rather than binding.  *Id.*  As another court in this district has

4    noted, however, district courts within the Ninth Circuit continue to cite "*Pacific Maritime*

5    for proposition that the [joint employer theory of liability] and economic realities test

6    appl[y] in the Title VII context."  *See Drottz v. Park Electrochemical Corp.*, 2012 WL

7    1344729, at *5 n.6 (D. Ariz. Apr. 18, 2012) (collecting cases).[14]   Relying on this

8    authority, and in view of "Congress' directive to read Title VII broadly so as to best

9    effectuate its remedial purposes," *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182,

10   1192 (9th Cir. 1998), the Court finds that the joint employer theory of liability may be

11   applied in this Title VII case.

12        Although the First Amended Complaint contains minimal allegations that could be

13   construed as asserting a joint employer theory of liability, it is sufficient because

14   "whether a plaintiff is jointly employed is typically a factual issue addressed after the

15   plaintiff has had an opportunity to conduct discovery."  *Boire v. Greyhound Corp*., 376

16   U.S. 473 (1964) (stating that "whether [an entity] possessed sufficient indicia of control

17   to be an 'employer' is essentially a factual issue); *see also Global Horizons*, 860

18   F. Supp. 2d at 1178, 1182–83 (applying the joint liability test in a Title VII case filed by

19   foreign workers against both a recruitment company and the farms in the United States

20   where they worked to determine that the foreign workers sufficiently alleged that the

21   farms and the company "jointly controlled the terms and conditions of employment," and

22   denying the farms' motions to dismiss).

23        During the default damages hearing, the EEOC presented testimony and evidence

24   supporting a finding that Recession Proof USA LLC and Prime Time Marketing

25

26   ─────────────────
     [14] The court in *Drottz* further found that the Ninth Circuit approved of applying the
     joint employer test in Title VII cases in its later decision in *Murray v. Principal Fin.
     Group, Inc*., 613 F.3d 943, 945 (9th Cir. 2010).  *Drottz*, 2012 WL 1344729, at *4.

27   However, in *Murray* the court clarified the standard for distinguishing between
     employees and independent contractors, not for determining which entity is a plaintiff's

28   employer.  *See id.* (citing *Murray*, 613 F.3d at 945).

1    Solutions LLC d/b/a USA Supreme Technology were joint employers of Miller and

2    Frasso.  Brunson and Smith were both members of Recession Proof.  (Doc. 51, Ex. 1.)

3    Smith was the managing member of Prime Time Marketing Solutions LLC, and USA

4    Supreme Technology is a trade name owned by Prime Time Marketing Solutions.

5    (Doc. 51, Ex. 3.)  Employees of Recession Proof were required to enter a confidentiality

6    agreement with Brunson, Recession Proof, Smith, and "USA Supreme Tech."  (Doc. 51,

7    Ex. 7; Doc. 59 at 68.)

8        In addition, USA Supreme Technology is referenced in the Recession Proof terms

9    and conditions as having a financial relationship with Recession Proof.  (Doc. 51, Ex. 5;

10   Doc. 59 at 31-32, 71-72.)  Specifically, the provision outlining the terms and conditions

11   between the client or prospect and Recession Proof states that: "Cardholder

12   acknowledged receipt of services/goods in the amount of the total shown on the

13   customer's authorization form and agrees to perform the obligations set forth in the

14   cardholder's agreement with the issuer to USA Supreme Technology."  (Doc. 59 at 32.)

15   Rice also testified that Recession Proof employees obtained computer equipment and

16   office supplies from USA Supreme Technology.  (Doc. 59 at 28.)  Rice further testified

17   that he believed USA Supreme Technology was Recession Proof's "parent company"

18   because Recession Proof's invoices notified customers that "were getting in business

19   with USA Supreme Technologies and Recession Proof USA."  (Doc. 59 at 30.)

20       The EEOC presented evidence that Smith participated in Recession Proof's

21   decision making and daily activities including approving sales scripts, approving Miller's

22   hiring, and approving Miller's termination after Brunson informed him of the incident,

23   including his use of the "N" word.  (Doc. 59 at 20-24.)  Rice testified that Brunson

24   provided Smith with daily updates about Recession Proof's operations, e-mailed him

25   updates of the sales script for his approval, and contacted him daily about "one issue or

26   another issue."  (Doc. 59 at 20-21.)

27       In addition, the EEOC investigator, Michael Jaimez, testified that he contacted

28   Brunson and Smith regarding Miller's charge of discrimination, but that Smith never

1    responded.  (Doc. 59 at 55.)  Another Recession Proof employee, Kyle Wheeler, later

2    advised the EEOC that Smith had authorized him to conciliate the charge, unless it

3    involved a financial component.  (Doc. 59 at 55-56.)

4           Although it is not clear in what role Smith participated in Recession Proof's daily

5    affairs — as a member of Recession Proof or as a member of Prime Time Marketing

6    Solutions LLC d/b/a USA Supreme Technology — because Defendants' default

7    precluded discovery on this issue, the Court infers that Smith acted on behalf of both

8    entities.  *Cf. Taylor Made Golf Co., Inc. v. Carsten Sports, Ltd.*, 175 F.R.D. 658, 663

9    (S.D. Cal. 1997) ("doubts about the actual assessment of damages will be resolved

10   against the party who frustrates the proof of such, and the fact finder may calculate

11   damages at the highest reasonably ascertainable value").  Thus, Smith's actions, on

12   behalf of Prime Time Marketing Solutions LLC d/b/a USA Supreme Technology, were

13   sufficient to establish that Prime Time Marketing Solutions LLC is liable as a joint

14   employer with Recession Proof of Miller and Frasso.

15          The EEOC has sufficiently established a joint employer relationship between

16   Recession Proof and Prime Time Marketing Solutions LLC d/b/a USA Supreme

17   Technology.  Additionally, based on testimony that Smith approved the decision to

18   terminate Miller after being informed of the incident giving rise to his termination, the

19   EEOC has also sufficiently shown that these employers are liable for the discriminatory

20   conduct as to Miller.  *See Guifu Li v. A Perfect Day Franchise, Inc.*, 2012 WL 2236752,

21   at *10 (N.D. Cal. Jun. 15, 2002) (taking the well-pleaded allegations that defendants were

22   joint employers as true on default).  Because Defendants' default frustrated the EEOC's

23   ability to conduct further discovery on its joint employer theory of liability, the Court

24   finds that the record supports an inference that Recession Proof and Prime Time

25   Marketing Solutions LLC d/b/a USA Supreme Technology were also aware of the

26   discriminatory conduct as to Frasso.  *Cf. Taylor Made Golf*, 175 F.R.D. at 663.

27   Accordingly, the Court recommends that Recession Proof USA LLC and Prime Time

28

1  Marketing Solutions d/b/a USA Supreme Technology be held liable as joint employers

2  for the discriminatory conduct alleged in the First Amended Complaint.

3  **4.     Smith's Liability as a Sole Proprietor**

4  Finally, the EEOC alleges that Phillip Smith may be held liable under Title VII as

5  a sole proprietor of USA Supreme Technology to facilitate the EEOC's ability to satisfy

6  any judgment in this case.  (Doc. 51 at 14.)  "USA Supreme Technology" is a trade name

7  used by Prime Time Marketing Solutions LLC.  (Doc. 51, Ex. 3.)  To support its "sole

8  proprietor" argument, the EEOC cites a Seventh Circuit case, *EEOC v. Oak Lawn Ltd.*,

9  987 F. Supp. 647, 650 (N.D. Ill. 1997), in which the court found that, if an individual is a

10  sole proprietor with fifteen or more employees, that individual may be liable under Title

11  VII.  *Id*. (citing *EEOC v. AIC Security Investigators, Ltd.*, 55 F.3d 1276, 1280 n.2 (7th

12  Cir. 1995).

13  The EEOC, however, has not cited any Ninth Circuit or other authority in support

14  of its assertion that Smith, a managing member of Prime Time Marketing Solutions LLC,

15  doing business under the trade name USA Supreme Technology, can be held individually

16  liable "as a sole proprietor USA Supreme Technology."  (Doc. 51 at 14.)  The EEOC

17  does not explain how the *Oak Lawn* decision — which did not involve an LLC and its

18  managing member or an LLC operating under a trade name — applies here.  Indeed, it

19  appears the EEOC's "sole proprietor" argument is simply another attempt to pierce the

20  LLC veil and hold Smith personally liable for Prime Time Marketing Solutions LLC,

21  operating under the trade name USA Supreme Technology.

22  In view of the EEOC's failure to fully explain its argument and in the absence of

23  controlling authority, the Court resolves this issue against the EEOC.  Therefore, the

24  Court concludes that the second and third *Eitel* factors do not support the entry of default

25  judgment against Smith as a sole proprietor.

26  **III.     Standards for an Award of Damages in a Default Judgment**

27  Having determined that Recession Proof USA LLC and Prime Time Marketing

28  Solutions LLC d/b/a/ USA Supreme Technology are liable under Title VII, the Court next

determines the "amount and character" of relief to award.  *See James v. Frame*, 6 F.3d 307, 310 (9th Cir. 1993) (district court has "wide latitude" and discretion in determining the amount of damages to award upon default judgment).  Entry of a default judgment for monetary damages is appropriate without a hearing if "the amount claimed is a liquidated sum or capable of mathematical calculation."  *Davis v. Fendler*, 650 F.2d 1154, 1161 (9th Cir.1981) (no hearing necessary when documents show that the judgment amount is based upon a definite figure).

Unliquidated and punitive damages, however, require "proving up" at an evidentiary hearing or through other means.  *See Black & Decker, Inc. v. All Spares, Inc.*, 2010 WL 3034887, at *3 (D. Ariz. Aug. 3, 2010).  "[P]laintiff's burden in 'proving up' damages on a motion for default judgment is relatively lenient.  If proximate cause is properly alleged in the complaint, it is admitted upon default.  Injury is established and plaintiff need only prove that the compensation sought relates to the damages that naturally flow from the injuries pled."  *Id.* (citing *Philip Morris USA, Inc. v. Castworld Prods, Inc.*, 219 F.R.D. 494, 498 (C.D. Cal. 2003)).  "In determining damages, the court can rely on the declarations submitted by the plaintiff."  *Philip Morris*, 219 F.R.D. at 498. The plaintiff must provide evidence of its damages, and the damages "must not differ in kind, form, or exceed in amount, what is demanded in the pleadings."  Fed. R. Civ. P. 54(c); *see also Freemyer v. Kyrene Village II, LLC*, 2011 WL 42681, at *3 (D. Ariz. Jan. 6, 2011)).

**IV.   Remedies Available Under Title VII**

Having found that default judgment should be entered in favor of the EEOC against Defendants Recession Proof USA LLC and Prime Time Marketing Solutions LLC,  the Court considers Miller's and Frasso's claimed damages and the EEOC's request for injunctive relief.  As the Supreme Court explained in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975), the main objectives of Title VII are to eradicate employment discrimination and to make persons whole for injuries suffered due to such discrimination. The Court directed that "[t]he injured party is to be placed, as near as may

be, in the situation he would have occupied if the wrong had not been committed." *Id.* at 419–20.  (quoting *Wicker v. Hoppock*, 73 U.S. 94 (1867)).  Title VII permits courts to grant equitable remedies to employees who have been impermissibly discriminated against.  *See* 42 U.S.C. § 2000e-5(g).   The relevant remedies include reinstatement, reassignment, awards of front pay, back pay, and prejudgment interest.  *Edwards v. Occidental Chem. Corp.*, 892 F.2d 1442, 1448 (9th Cir. 1990).  "The district court has wide discretion in awarding remedies to make a Title VII plaintiff whole." *Edwards*, 892 F.2d at 1448.  Here, the EEOC has asserted claims for back pay, prejudgment interest, compensatory damages, punitive damages, and injunctive relief.

### A.    Back Pay

Courts routinely award back pay in Title VII cases.  *Kraszewski v. State Farm Gen. Ins. Co.*, 912 F.2d 1182, 1184 (9th Cir. 1990).  Back pay "[d]amages are determined by measuring the difference between the actual earnings for the period and those which [the plaintiff] would have earned absent the discrimination by defendant." *Gotthardt v. Nat'l R.R Passenger Corp.*, 191 F.3d 1148, 1158 (9th Cir. 1999); *see also Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1020 (9th Cir. 2000).

Back pay is generally calculated from the date of the discriminatory discharge until the date of the final judgment.  *Kraszewski*, 912 F.2d at 1184–85; *Edwards*, 892 F.2d at 1449.   However, when a defendant employer's business is sold, closed or terminated, the period of back pay ends at the time the business ceased to operate.  *See Richardson v. Rest. Mkt. Assocs., Inc.,* 527 F. Supp. 690, 696 n.1 (N.D. Cal. 1981) (noting that the court would not award back pay for the period after the defendant ceased operations in the area); *Helbling v. Unclaimed Salvage and Freight Co.,* 489 F. Supp. 956, 963 (E.D. Pa. 1980) (explaining that back pay calculated from date of injury until defendant store closed and job ceased to exist).

In calculating an award of back pay, the court should subtract "[a]ny wages the plaintiff actually earned after termination, plus the amount the plaintiff would have earned if he had made reasonable efforts." *Cassino v. Reichhold Chems. Inc.*, 817 F.2d

1338, 1345 (9th Cir. 1987).   However, "state unemployment benefits should not be deducted from any award of back pay under Title VII."  *Murrell-Travland v.On Q Fin., Inc.*, 2013 WL 393133, at *3 (D. Ariz. Jul. 30, 2013) (citing *Kauffman v. Sidereal*, 695 F.2d 343, 347 (9th Cir. 1982)).    "[B]ack pay should be denied only for reasons which . . . would not frustrate the central statutory purposes of *eradicating* discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."  *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1495 (9th Cir.1995) (internal quotation marks omitted) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)); *see also Caudle*, 224 F.3d at 1020 (stating that there is a presumption in favor of awarding back pay damages).

In addition, when requested in the complaint, the court should add prejudgment interest to awards of back pay damages to compensate employees for the loss of use of their money prior to judgment.  *See Loeffler v. Frank*, 486 U.S. 549, (1988) (recognizing that Title VII authorizes prejudgment interest as part of the back pay remedy) (citing 42 U.S.C. § 2000e-5(g)).

### 1.      Back Pay Damages for Miller

Miller was terminated from Recession Proof on April 22, 2010.  (Doc. 59 at 94.) The EEOC's motion requests back pay for the period from April 22, 2010 to December 2012.  During the default damages hearing, the EEOC offered evidence in support of back pay damages for Miller for that same period.  However, Recession Proof filed articles of termination and ceased to exist on September 23, 2011.  (Doc. 51, Ex. 1; Hearing Ex. 39).  Thus, the Court limits its calculation of back pay damages to the period from April 22, 2010 to September 23, 2011.[15]

---

[15] At the default judgment hearing, EEOC investigator Jaimez testified that, in a February 17, 2011 telephone conversation, Brunson said he was not going to "go down or drown" because of the EEOC and that he would close the company and declare bankruptcy.  (Doc. 59 at 48-51.)  Through this testimony, the EEOC may be suggesting that Brunson or Smith dissolved Recession Proof in an effort to avoid liability and, therefore, an award of back pay should be calculated beyond the dissolution of Recession Proof.  The Court would reject any such suggestion because Recession Proof was not terminated until September 23, 2011, seven months after Brunson's statements (Doc. 51, Ex. 1; Hearing Ex. 39), and other testimony at the default damages hearing established

1    During the default damages hearing, Miller testified that he was paid twenty-five

2   percent commission for each sale he made at Recession Proof.  (Doc. 59 at 92.)  Miller

3   testified that he made one $7,000.00 sale during his employment that generated

4   commission of $1,750.00.  (Doc. 59 at 80, 91-93.)  Miller explained that the advertising

5   packages that were available to sell ranged from $500.00 to $10,000.00.  (Doc. 59 at

6   105.)  Although a $7,000.00 sale was on the high end, based on his twenty-four years of

7   sales experience and the ease with which he made the $7,000.00 sale, Miller estimated

8   that he could have made seven $7,000.00 sales per quarter while working at Recession

9   Proof and, thus could have earned $12,250.00 commission per quarter (*$7,000 x .25*

10   *commission x 7 sales = $12,250.00*).  (Doc. 59 at 62, 93-94, 105.)

11    Miller's estimate that he could have made seven $7,000.00 sales per quarter likely

12   overstates his damages because it is based on a single $7,000.00 sale that Miller

13   acknowledges was at the high end of the $500.00 to $10,000.00 range of advertising

14   packages that he could have sold.  An average of those packages, $5,200.00 is a more

15   reasonable figure.   Accordingly, the Court finds that Miller could have made seven

16   $5,200.00 sales per quarter resulting in $9,100.00 in commission per quarter (*$5,200.00 x*

17   *.25 commission x 7 sales per quarter = $9,100.00 or $3,033 per month*).

18    After Miller was terminated, he was unemployed for approximately two-and-one-

19   half months. (Doc. 59 at 94.)  He worked at IFree America from July 2010 to August

20   2010 and earned $200.00.  (Doc. 59 at 94, 103.)  Miller was unemployed from September

21   10, 2010 until January 2011.  (*Id.* at 95.)   Miller worked for TV Travel from January

22   2011 to October 2011 where he earned $3,300.00 per quarter.[16]  (*Id.*)

23

24   that Recession Proof had operating issues that were unrelated to the EEOC investigation.
25   (*See* Doc. 59 at 26-28 (former Recession Proof employee Doug Rice testified that he
     would not characterize Recession Proof as a "good business," but as "scam" because
26   from shortly after it began operations, it was not able to provide the services it was
     selling to customers)).

27   [16] In October 2011, Miller went to work for Jim Glover Chevrolet in Oklahoma
28   making $3,500.00 per month from October 2011 to December 2011.  (*Id.* at 96-97.)
     Miller worked for Jim Glover Chevrolet in 2012 where he made $1,600 per month for
     three months, and $3,500 per month for the remaining nine months.  (*Id.* at 97-98.)  The

1    If Miller had not been terminated, he would have earned $51,561.00 (*$5,200 x .25*

2    *commission x 7 sales per quarter x 5 and2/3 quarters or $3,033 per month x 17months*) at

3    Recession Proof from April 2010 to September 2011.   During the default damages

4    hearing, Miller presented evidence that during the time period after his termination until

5    September 2011 he earned $10,100, which leaves him $41,461.00 in damages for back

6    pay.  (Hearing Ex. 45, Doc. 59 at 138-39.)

7             **2.      Back Pay Damages for Frasso**

8    Frasso was terminated from Recession Proof on May 6, 2010.  (Doc. 51 at 5-7.)

9    The EEOC's motion requests back pay for the period from May 2010 to December 2012.

10   (Doc. 51.)  During the default damages hearing, the EEOC offered evidence in support of

11   back pay damages for Frasso for that same period.  (Doc. 59 at 143.)  As set forth above,

12   Recession Proof ceased to exist in September 2011.  Therefore, the Court limits its

13   calculation of back pay damages to the period from May 2010 to September 2011.

14   During the default damages hearing, Frasso testified that earned $650.00 per week,

15   or approximately $2,600.00 per month (or $7,800.00 per quarter), at Recession Proof.

16   (Doc. 59 at 126.)  Based on his "initial meeting," Frasso expected that after his first

17   month of employment, he would become the sales floor manager and earn $1,000.00 per

18   week.  Frasso's employment was terminated and he never became a sales manager and he

19   does not seek damages based on that higher anticipated figure.  (*Id*.)  Frasso estimated

20   that he could have earned $83,200.00 (*$7,800.00 per quarter for ten quarters =*

21   *$78,000.00 + $5,200.00 for .66 percent of the second quarter in 2010*) working for

22   Recession Proof from May 2010 to December 2012.  (Doc. 59 at 144.)  The Court,

23   however, finds that for the period May 2010 to September 2011, Frasso would have

24   earned $67,000.00 at Recession Proof (*$2,600 per month x 16 months*).

25   After Frasso was terminated, he was unemployed from May 2010 to July 2010.

26   (*Id*. at 127.)  Frasso then worked for Consolidated Marketing Services from July 2010

27

28   Court does not consider this income in reducing Miller's back pay award because it was
earned after the period for the back pay calculation.

until June 2011.  (*Id.*)  Frasso's pay ranged from $100.00 to $650.00 per week, which is between $400.00 to $2,600.00 per month.  (*Id.* at 128.)  Because Frasso did not provide more specific information about his earnings for this period, and this information was within his control and not information that the EEOC needed to obtain in discovery, the Court will calculate Frasso's earnings for this period at $2,500 per month, which is at the high end of the range he provided and, therefore, calculate the reduction in his back pay as $2,500 per month for eleven months, from July 2010 and June 2011 (*$2,500 x 11 = $27,500.00*).  Frasso next worked for TV Travel from July 2011 until February 14, 2012, where he earned $8.00 per hour (for 30 to 37 hours per week), plus approximately $500.00 per month in commission.[17]  (*Id.* at 128-29.)  Again, because Frasso did not provide more specific information about his earnings in this period, the Court will calculate the reduction in his back pay based on an average of his reported hours, or 33.5 hours per week, at $8.00 per hour, for three months, plus $500.00 per month in commissions.  (*33.5 x 8 x 4 x 3 = $3,216 + $1,500 ($500 x 3) = $4,716*).  Therefore, for the period after his termination from Recession Proof in May 2010, until the company ceased to exist in September 2011, Frasso earned $32,216.00 leaving him $34,784.00 in damages for back pay.

### 3.    Prejudgment Interest on Back Pay

An award of prejudgment interest on a back pay award is appropriate. *Domingo v. New England Fish Co.*, 727 F.2d 1429 (9th Cir.1984).   The rate of return on pre-judgment interest is within the court's discretion.  *W. Pac. Fisheries, Inv. v. SS President Grant*, 730 F.2d 1280, 1288 (9th Cir.1984).  In exercising this discretion, the court must consider that prejudgment interest is an element of compensation, not a penalty.  *Id.*

---

[17] Frasso was unemployed from February 14, 2012 until April, May, or June of 2012.  (*Id.* at 130.)  During that time, Frasso did odd jobs and earned about $1,000.00. (*Id.* at 131.)  Frasso next worked for FLS from June 2012 to November 2012.  He was paid about $1,700.00 per month.  (*Id.*  at 131-32.)  Frasso earned $1,000.00 working for The Money Factory for four weeks in December 2012.  (*Id.* at 132-33.)  Because Frasso's income after September 2011 was earned after the period for the back pay award, the Court does not consider it in calculating the reduction of Frasso's back pay award.

1    The EEOC seeks prejudgment interest on the back pay awards based on the IRS

2    prime rate per quarter.  (Doc. ¶ 16; Doc. 59 at 142, 144.)  The Court finds the appropriate

3    rate at which to award prejudgment interest is the weekly average one-year constant

4    maturity Treasury yield.  *See Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d

5    620, 628 (9th Cir. 2007) ("Generally, 'the interest rate prescribed for post judgment

6    interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of prejudgment interest

7    unless the trial judge finds, on substantial evidence, that the equities of that particular

8    case require a different rate.'" (quoting *Grosz–Salomon v. Paul Revere Life Ins. Co.*, 237

9    F.3d 1154, 1163-64 (9th Cir. 2001); *see also W. Pac. Fisheries*, 730 F.2d at 1288

10   (same); *Columbia Brick Works, Inc. v. Royal Ins. Co.*, 768 F.2d 1066, 1071 (9th Cir.

11   1985) (calculating interest using the Treasury bill rate).

12       Here, the Court has applied an average of the one-year constant maturity Treasury

13   rate to determine the prejudgment interest on the recommended back pay awards, from

14   the time of Miller's and Frasso's terminations until the present, which the Court

15   calculates as .20%.  *See* http://www.federalreserve.gov/releases/H15/data.htm.[18]  Based

16   on a back pay award of $41,461.00 for Miller, and a per annum calculation, the Court

17   awards Miller prejudgment interest in the amount of $276.00.  *($41,461.00 x .002 =*

18   *$82.92 ÷ 365 = $.23 x 1215 days[April 22, 2010 to Aug. 19, 2013 = 1215 days of*

19   *prejudgment interest] = $276.00)*.  Based on an award of $34,784.00 for Frasso, and a

20   per annum calculation, the Court awards Frasso prejudgment interest in the amount of

21

---

22   [18]  This interest rate is based on information on the Board of Governors of the
     Federal Reserve System website using historical data for treasury constant maturities,
23   one-year, annual, for years 2010, 2011, and 2012, and the weekly average one-year
     constant Treasury yield for the week preceding the date of this report and
24   recommendation for 2013.  *See* http://www.federalreserve.gov/releases/H15/data.htm
     (2010, .32%; 2011 .18%, 2012, .17%, 2013, .12%).  The Court determined the applicable
25   interest rate, .20%, by averaging these interest rates [(*.32 + .18 + .17 +.12*) ÷ 4)].
     Although this calculation may not precisely reflect the applicable weekly average one-
26   year constant maturity Treasury yield for the period from date on which the back pay
     periods commenced until the present, the Court exercises its discretion to award
27   prejudgment interest based on this approximate calculation because prejudgment interest
     is an element of compensation, not a penalty.  *See W. Pac. Fisheries*, 730 F.2d at 1288.

28

1   $228.19.  ($*34,784.00 x .002 = $69.56 ÷ 365 = $.19 x 1201 days [May 6, 2010 to Aug.*

2   *19, 2013 = 1201 days of prejudgment interest] = $228.19*).

3       **B.    Compensatory Damages**

4       The Court may award compensatory damages for "future pecuniary losses,

5   emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and

6   other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3).  A claimant's testimony alone may

7   be sufficient to support an award of compensatory damages for emotional harm.  *See*

8   *Chalmers v. City of L.A.*, 762 F.2d 753, 761 (9th Cir. 1985) (affirming compensatory

9   damages awarded based upon plaintiff's testimony); *Williams v. TransWorld Airlines,*

10   *Inc.,* 660 F.2d 1267, 1273 (8th Cir. 1981) (recognizing that "the plaintiff's own testimony

11   may be solely sufficient to establish humiliation or emotional distress); *Muldrew v*

12   *Anheuser-Busch, Inc.*, 728 F.2d 989 (8th Cir. 1984) (awarding plaintiff $52,644.80 in

13   damages for mental anguish and emotional distress resulting from losing his house and

14   car, marital harmony, and the respect of his children after he was discriminatorily

15   discharged).

16       Compensatory and punitive damages are capped at limits set by the statute based

17   on the defendant employer's number of employees.[19]  *Id.*  In this case, those damages are

18   capped at $50,000.00 per claimant.[20]  *See* 42 U.S.C. § 1981a(b)(3)(A) (when an employer

19   has more 14 and fewer than 101 employees, "[t]he sum of the amount of compensatory

20   damages . . . and the amount of punitive damages, shall not exceed [$50,000], for each

21   complaining party").

22       Compensatory damages "may be had for any proximate consequences which can

23   be established with requisite certainty."  *See EEOC Enforcement Guidance:*

24   *Compensatory and Punitive Damages Available under § 102 of the Civil Rights Act of*

25

26       [19] The cap represents the total amount of compensatory and punitive damages that each claimant may recover, no matter how many separate Title VII claims are brought

27   before the court.  *See Baty v. Willamette Indus., Inc.*, 985 F. Supp. 987 (D. Kan. 1997).

28       [20] The EEOC alleges that Defendants had "at least 15 employees" and states that the $50,000 statutory cap applies.  (Doc. 16 ¶¶ 5 and 7; Doc. 59 at 141.)

*1991 (EEOC Enforcement Guidance)*, 1992 WL 1364354, at *4 (citing 22 Am. Jur. 2d *Damages* § 45 (1965)).  Although compensatory damages are available for emotional harm, the claimant must establish its "existence, nature, and severity."  *Id.* at *5.  "Emotional harm may manifest itself, for example, as sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self-esteem, excessive fatigue, or a nervous breakdown."  *Id*.  Emotional harm may manifest physically as "ulcers, gastrointestinal disorders, hair loss, or headaches."  *Id*.  An award for emotional harm is warranted only if there is a sufficient causal connection between the respondent's illegal actions and the claimant's injury.  *Id*. (citing *Gore v. Turner*, 563 F.2d 159, 164 (5th Cir. 1977)).  The court should consider facts that are relevant to whether and to what extent the employer caused the employee's emotional harm.  *See Vance v. Bell Tel. and Tel. Co.*, 863 F.2d 1503, 1516 (11th Cir. 1989) (finding award of $500,000 in compensatory damages excessive when claimant's emotional harm was due in part to personal difficulties — such as an automobile accident, dietary issues, and family illness and death — that were not caused or exacerbated by the discriminatory conduct).

### 1.      Compensatory Damages for Miller

Miller testified that before he worked for Recession Proof, he lived in a large house with a roommate and her son for over four years.  (Doc. 59 at 81) Miller's roommate Marcia Rose testified that after his termination, Miller was "depressed [and] withdrawn," and that he was not the "jolly happy person" that he was before the termination.  (Doc. 59 at 113-114.) After his termination, Miller could not afford to pay rent and moved to a two bedroom apartment.

Miller eventually sold his belongings and moved to Oklahoma where he lived with his parents for five months until he "got [his] own place."  (*Id*. at 81-83,  86-88.)  Miller described the living arrangement as strained.  Miller testified that he was "devastated," and felt like he was "losing everything."  (*Id*. at 82.)  Miller felt like "less of a man" because he had to borrow money from his roommate and his parents.  (Doc. 59 at 82-83.)  Miller's relationship with a girlfriend of eight months and with other friends suffered due

to the stress of his termination.  (Doc. 59 at 83-84.)  Miller lost touch with his friends because he could not "afford to hang out with" them and also lost his girlfriend.  (*Id*. at 82-84, 87.)

About a month after his termination, Miller was hospitalized for three days for chest pain due to a tear in the lining of his esophagus.  (Doc. 59 at 84.) During his hospital stay, Miller learned that he had high blood pressure and he continues to take blood pressure medication.  (Doc. 59 at 85.)  Although Miller had experienced heart burn before his termination, he did not take blood pressure medication until after he was terminated.  (*Id.*)

Since his termination, Miller has had low self-esteem and "think[s] that people are still looking at [him] as a black person" and wonders if other employment-related decisions are based on his race.  (*Id*. at 88-89.)  Miller was confident in his sales ability and had high self-esteem before his termination.  (*Id*. at. 88)  He testified that now he is unsure of himself.  (*Id.* at 89.)

The record reflects that Miller experienced personal difficulties after his termination including strained relationships with family members, loss of self-esteem and self-confidence, and worsening physical problems, including high blood pressure.  These complaints are considered possible manifestations of emotional harm in the EEOC Guidelines.  *See EEOC Enforcement Guidance*, 1992 WL 1992 WL 1364354, at *4 (Jul. 14, 1992) (stating that manifestations of emotional harm include "sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self-esteem, excessive fatigue, . . . a nervous breakdown[,] . . . ulcers, gastrointestinal disorders, hair loss, or headaches").

Although Miller's emotional harm does not appear severe, that harm has continued for over two years since his termination and Miller continues to suffer from low self-esteem and continues to take high blood pressure medication.  Considering Miller's and Rose's testimony and the facts of this case, including that Miller was subjected to a single incident of discriminatory conduct, the Court finds the EEOC's request for $30,000 in

compensatory damages for Miller is excessive and recommends that Miller be awarded $15,000 in compensatory damages.  *See Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1215-16 (6th Cir. 1996) (affirming award of $50,000 in compensatory damages when witnesses testified that plaintiff was "extremely upset and frightened after she was discharged," and plaintiff testified that she continued to suffer nightmares, weight loss during her pregnancy, and excessive nervousness); *DeNieva v. Reyes*, 966 F.2d 480, 487 (9th Cir.1992) (plaintiff testified to suffering emotional distress manifested by insomnia, dizziness and vomiting and received $50,000 compensatory damages); *Sec'y of HUD v. Blackwell*, 908 F.2d 864, 872-73 (11th Cir. 1990) ($40,000 award upheld on basis of testimony regarding humiliation, insomnia and headaches; *Moody v. Pepsi-Cola Metro Bottling Co.*, 915 F.2d 201, 210 (6th Cir.1990) ($150,000 award upheld on basis of testimony that plaintiff was shocked and humiliated and forced to live apart from family because of termination); *EEOC v. Trimbco, Inc.*, 2009 WL 733888, at *3-4 (N.D. Cal. Mar. 17, 2009) (awarding plaintiffs in a hostile work environment case based on sex and national origin $50,000 each in compensatory damages based on complaints of stress, anxiety, loss of sleep, vomiting, loss of contact with friends, loss of self-esteem, and strained relationship with family members); *Erebia v. Chrysler Plastic Prods. Corp.*, 772 F.2d 1250, 1260 (6th Cir. 1985) (reversing award of $10,000 in compensatory damages and directing district court to award nominal compensatory damages when plaintiff's only proof of emotional harm included statements that he was "highly upset" about racial slurs and that "you can only take so much."); *Gilbert v. Hotline Delivery*, 2001 WL 799576, at *3 (S.D.N.Y. Jul. 10, 2001) (awarding $2,000 in compensatory damages because plaintiff's termination likely exacerbated health-related problems and noting that after plaintiff's termination, he could not afford medication co-payments, had to abandon his health insurance, had to apply for medicaid and food stamps and take out student loans, and experienced increased stress and high blood pressure that interfered with his academic performance).

### 2. Compensatory Damages for Frasso

Frasso testified that after his termination, he and his wife of eleven years separated for "a couple of months." (Doc. 59 at 116, 125.) Frasso had difficulty paying his bills and his wife had to assume his share of their financial obligations. (*Id.*) Frasso felt "less than a man [because] he wasn't able to take care of [his] responsibilities . . . ." (*Id.*) Frasso felt "angry," "betrayed[,] sad[, and] disappointed." (*Id.*) He worried about getting evicted because of the financial strain. (*Id.* at 126.) Frasso still feels angry and upset. (*Id.* at 133.)

Considering Frasso's testimony and the facts of this case, the EEOC's request for $20,000 in compensatory damages on Frasso's behalf is excessive. After his termination, Frasso experienced marital strain and was separated from his wife for several months. Marital strain is recognized as a possible manifestation of emotional harm in the EEOC Guidelines. *See EEOC Enforcement Guidance*, 1992 WL 1364354, at *4. However, feelings of anger and betrayal are not included as manifestations of emotional harm and do not support an award of compensatory damages. Additionally, Frasso's emotional harm appears non-severe, and other than the two-month separation from his wife, there is no evidence about the duration of his personal difficulties, including financial hardship. On these facts, the Court exercises its discretion to recommend that Frasso be awarded $5,000.00 in compensatory damages.

### C. Punitive Damages

Under the Civil Rights Act of 1991, a plaintiff can recover punitive damages when a defendant "engaged in unlawful intentional discrimination" prohibited by Title VII. 42 U.S.C. § 1981a(a)(1). Punitive damages are permissible "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). In *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999), the Supreme Court clarified the standard to be applied in assessing punitive damages in the employment discrimination context. The Court rejected the

argument that punitive damages are available only when an employer's was "egregious." *Id.* at 534.  Rather, the Court held that to be liable for punitive damages, the employer "must at least discriminate in the face of a perceived risk that its actions will violate federal law . . . ." *Id.* at 536.  Some of the factors considered in an award of punitive damages are the outrageousness of the defendant's conduct, the defendant's financial status, the injury suffered, the relationship between the parties, and the aggravating and mitigating factors. *Conseco Fin. Serv. Corp. v. N. Am. Mtg. Co.*, 381 F.3d 811, 823 (8th Cir.2004).

In support of its request for punitive damages, the EEOC argues that the Court should send "a strong message" to Smith and the business entities.  (Doc. 59 at 141.)  In the First Amended Complaint, the EEOC alleges that Defendants' conduct was "malicious" or evidenced "reckless indifference."  (Doc. 16 ¶ 7.)  The First Amended Complaint alleges that Brunson regularly called or referred to Frasso and other employees by the "N" word.  (Doc. 16  ¶ 15.)  The First Amended Complaint further alleges that Miller was terminated for opposing the use of the "N" word, and Frasso was terminated for participating in an investigation pursuant to Title VII.  (Doc. 16 ¶¶ 16-17.)  The testimony at the default damages hearing supported the specific allegations of racially offensive comments directed at Miller and his termination for opposing such comments (Doc. 59 at 23, 73, 75-80), Brunson's regular use of racially offensive comments directed toward Frasso and other employees (Doc. 59 at 121), and Frasso's termination for engaging in protected activity (Doc. 59 at 44, 46, 123).

Miller and Frasso have presented sufficient evidence to show that Defendants engaged in unlawful discrimination against them with malice or reckless indifference to their federally protected rights.  Defendants fired Miller on the same day that he complained to his supervisor about Brunson's use of the "N" word.  Similarly, although Brunson and Rice had been advised that participation in the EEOC's investigation was a "protected activity," they fired Frasso almost immediately after he participated in a Title VII investigation of Miller's charge of discrimination.  Defendants' intentional

discriminatory actions constitute malice.  *See Hunter v. Allis-Chalmers*, 797 F.2d 1417, 1425 (7th Cir. 1986) (awarding punitive damages when defendant fired a worker for making a well-founded complaint with state FEP agency about persistent acts of racial harassment).  Accordingly, the Court will award punitive damages.  The EEOC requests $14,650.00 in punitive damages for Miller and $29,350.00 for Frasso.[21]  (Doc. 59 at 142.)

The award of punitive damages should bear some relationship to the harm caused by defendant's conduct.  *Gore*, 517 U.S. at 580 (explaining that the proper inquiry is whether there is a reasonable relationship between the punitive damage award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred).  Some courts have found a punitive award of three times the compensatory damages to be a suitable punitive award.  *See Lampley v. Oynx Acceptance Corp.*, 340 F.3d 478, 483 (7th Cir. 2003); *David v. Caterpillar, Inc.*, 185 F. Supp. 2d 918, 926-27 (C.D. Ill. 2002).  The Supreme Court, however, continues to rebuke the imposition of any rigid mathematical formula in determining the reasonableness of a punitive to compensatory damages ratio.

In this case, although the discriminatory conduct was of limited duration, it was extreme and it had severe results — the termination of Miller and Frasso.  Therefore, the Court finds that an award of two times the compensatory damages award is reasonable.  *See State Farm*, 538 U.S. at 425 (stating that the Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula" and has recognized that "few awards exceeding a single-digit ration between punitive and compensatory damages, to a significant degree, will satisfy due process").  Accordingly,

---

[21] The EEOC seeks the statutory cap of $50,000.00 each for compensatory and punitive damages for Miller and Frasso.  Because the EEOC seeks $30,000.00 in compensatory damages for Miller, it argues he should receive $20,000 in punitive damges, less the $5,350.00 received in settlement from Brunson.  (Doc. 42, Ex. A.)  It further argues that Frasso should receive $20,000.00 in compensatory damages and $30,000.00 in punitive damages, less the $650.00 received in settlement from Brunson. (*Id.*)

1    the Court recommends that Miller be awarded punitive damages in the amount of

2    $30,000 and that Frasso be awarded punitive damages in the amount of $10,000.

3        **D.    Injunctive Relief**

4        The EEOC also seeks injunctive relief.  The court may grant equitable relief to

5    effectuate the purposes of Title VII 42 U.S.C.2000e–5(g); *see also EEOC v. Goodyear*

6    *Aerospace Corp.*, 813 F.2d 1539, 1544 (9th Cir. 1987) ("Generally, a person subjected to

7    employment discrimination is entitled to an injunction against future discrimination.")

8    The Supreme Court has recognized that "Congress' purpose in vesting a variety of

9    'discretionary' powers in the court was . . . to make possible the 'fashioning of the most

10   complete relief possible.'"  *Albermarle Paper Co*, 422 U.S. at 421.

11       In an effort to prevent Defendants from engaging in further discrimination, the

12   Court recommends injunctive relief: (1) enjoining Recession Proof USA LLC, and Prime

13   Time Marketing Solutions LLC d/b/a USA Supreme Technology, their officers,

14   successors, assigns, and all persons in active concert or participation with them, from

15   engaging in discrimination based on race; and (2) ordering Recession Proof USA LLC,

16   and Prime Time Marketing Solutions LLC d/b/a USA Supreme Technology, to institute

17   and carry out policies, practices, and programs that provide equal employment

18   opportunities for its employees and that eradicate the effects of its past and present

19   unlawful employment practice.  The Court recommends an award injunctive relief in the

20   form of the proposed order attached to this Report and Recommendation.

21       **E.    Attorneys' Fees and Costs**

22       The EEOC seeks $3,971.71 in costs ($3,704.17 in costs in Miller's travel costs and

23   $267.00 in service costs.)  (Doc. 51 at 16.)  Pursuant to Federal Rule of Civil Procedure

24   54(a) and Local Rule of Civil Procedure 54.1 and 54.2, the time for filing claims for

25   costs, attorney's fees, and non-taxable expenses is after judgment has been entered.

26   According to Local Rule 54.2(b)(1) the party seeking attorney's fees must file a motion

27   within fourteen days after the entry of judgment.  The motion must specify the

28   "applicable judgment and the statutory or contractual authority entitling the party to the

1   award [] and the amount of attorney's fees sought or a fair estimate of such amount."

2   Then, within sixty days of judgment, a memorandum is to be filed that includes

3   documentation required by Local Rule 54.2(d).  Accordingly, a determination of costs,

4   attorney's fees, and non-taxable expenses is not before the Court at this time.

5       Accordingly,

6   **IT IS RECOMMENDED** that Plaintiff's hostile work environment claim be

7   dismissed pursuant to Plaintiff's voluntary withdrawal of that claim.  (*see* Doc. 51 at 7).

8   **IT IS FURTHER RECOMMENDED** that Plaintiff's Motion for Default

9   Judgment (Doc. 48) be **GRANTED** against Defendants Recession Proof USA LLC and

10   Prime Time Marketing Solutions LLC d/b/a USA Supreme Technology, as set forth

11   below, and be denied in all other respects.

12   **IT IS FURTHER RECOMMENDED** that Richard Miller be granted equitable

13   remedies in the amount of $41,461.00 in back pay and $276.00 in prejudgment interest,

14   totaling $41,737.0 in equitable damages.

15   **IT IS FURTHER RECOMMENDED** that Ron Frasso be granted equitable

16   remedies in the amount of $34,784.00 in back pay and $228.19 in prejudgment interest,

17   totaling $35,012.00 in equitable damages.

18   **IT IS FURTHER RECOMMENDED** Richard Miller be awarded $15,000.00 in

19   compensatory and $30,000.00 in punitive damages.

20   **IT IS FURTHER RECOMMENDED** that Ron Frasso be awarded $5,000.00 in

21   compensatory and $10,000.00 in punitive damages.

22   **IT IS FURTHER RECOMMENDED** that Miller and Frasso be awarded post-

23   judgment interest under 28 U.S.C. § 1961.

24   **IT IS FURTHER RECOMMENDED** that Plaintiff's request for attorney's fees

25   and costs be denied without prejudice.

26   **IT IS FURTHER RECOMMENDED** that the Court enter an Order providing

27   permanent injunctive relief in the form attached to this report and recommendation.

28

1      This recommendation is not an order that is immediately appealable to the Ninth

2 Circuit Court of Appeals.  Any notice of appeal pursuant to Federal Rule of Appellate

3 Procedure 4(a)(1) should not be filed until entry of the District Court's judgment.  The

4 parties shall have fourteen days from the date of service of a copy of this

5 recommendation within which to file specific written objections with the Court.  *See* 28

6 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6 and 72.  Thereafter, the parties have fourteen days

7 within which to file a response to the objections.  Failure to file timely objections to the

8 Magistrate Judge's Report and Recommendation may result in the District Court's

9 acceptance of the Report and Recommendation without further review.  *See United States*

10 *v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure to file timely objections to

11 any factual determinations of the Magistrate Judge may be considered a waiver of a

12 party's right to appellate review of the findings of fact in an order or judgment entered

13 pursuant to the Magistrate Judge's recommendation.  *See* Fed. R. Civ. P. 72.

14      Dated this 19th day of August, 2013.

Bridget S. Bade
United States Magistrate Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24 **ATTACHMENT**
25
26
27
28

1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT
7                       FOR THE DISTRICT OF ARIZONA
8
9  Equal Employment Opportunity          No. CV-11-01355-PHX-BSB
   Commission,
10                                        **[PROPOSED] ORDER**
                         Plaintiff,
11
   v.
12
   Recession Proof USA LLC, et al.,
13
                         Defendants.
14
15

16        On April 27, 2012, the Clerk of Court entered default as to Defendants Phillip D.
17   Smith d/b/a Recession Proof USA LLC, Phillip D. Smith d/b/a Prime Time Marketing
18   Solutions LLC, and Prime Time Marketing Solutions LLC d/b/a USA Supreme
19   Technology.  (Doc. 37.)  On September 7, 2012, the Clerk of Court entered default
20   against Defendant Recession Proof USA LLC.  (Doc. 47.)
21        On October 15, 2012, this Court ordered Plaintiff, Equal Employment Opportunity
22   Commission, to file a proposed order for injunctive relief.  On _____, 2013, the Court
23   entered default judgment against Defendants Recession Proof USA LLC and Prime Time
24   Marketing Solutions LLC d/b/a/ USA Supreme Technology.  (Doc. ___.)
25        Having considered the pleadings, the record, and supporting documents submitted
26   in this matter, as to Defendants Recession Proof USA LLC and Prime Time Marketing
27   Solutions LLC d/b/a/ USA Supreme Technology (Defendants),
28

**IT IS ORDERED THAT**:

1.      Defendants and their officers, agents, employees, successors, assigns and all persons in active concert or participation with them, are permanently enjoined from (a) discriminating against any employee on the basis of race and (b) retaliating against any employee because he or she (i) opposed discriminatory conduct believed to be unlawful under Title VII, (ii) reported conduct believed to be unlawful under Title VII to Defendants' managers, (iii) filed a charge or assisted or participated in the filing of a charge of race discrimination, or (iv) assisted or participated in an investigation or proceeding resulting from any of the preceding conduct.

2.      Defendants must develop written policies concerning racial discrimination and retaliation to conform to the law.  The written policies must include at a minimum: a clear and complete definition of racial discrimination and retaliation; a statement that racial discrimination and retaliation are prohibited and will not be tolerated; and, a description of the consequences, up to and including termination that will be imposed upon violators of the policy.  The policy shall be distributed to each of Defendants' current employees within ninety (90) days of the entry of this order and to all new employees of Defendants when hired.

3.      Defendants must implement injunctive relief, including but not limited to employee training on Title VII's prohibitions against racial discrimination and retaliation for all employees in the State of Arizona.  Defendants shall provide this live training at least once a year for a period of two years.

4.      Defendants must post a notice, attached as Attachment A, at all facilities, buildings, or offices in the State of Arizona regarding their intent to comply with Title VII; advising its employees of their right to complain about or oppose race discrimination; to be free from retaliation; and advising its employees of their right to contact federal and state anti-discrimination agencies.  This notice shall provide current contact information for the United States Equal Employment Opportunity Commission and the Arizona Civil Rights Division.

Attachment A

**NOTICE TO ALL EMPLOYEES**

It is unlawful under federal law, Title VII of the Civil Rights Act, and state law to discriminate against an employee on the basis of race in the recruitment, hiring, firing, compensation, assignment, or other terms, and conditions or privileges of employment.  It is also unlawful to retaliate against any person because the person protested or reported the discriminatory practices to management or the Equal Employment Opportunity Commission (EEOC).

Employers shall not discriminate against any employee on the basis of race and shall not retaliate against any employee for complaining about race discrimination.

If you believe you have been discriminated against, you have the right to seek assistance from:

**EEOC**, 3300 North Central Avenue, Suite 690

Phoenix, Arizona 85012

Telephone: (602) 640-5000

TTY: (602) 640-5072

Website (national): www.eeoc.gov

You have the right to file a charge with the EEOC if you believe you are being discriminated against or retaliated against for reporting discrimination.

No Retaliation Clause. It is against the law for any action to be taken against you by any supervisory or management official of your employer for: (1) opposing race discrimination or other discriminatory practices made unlawful by federal or state law; (2) filing a charge or assisting or participating in the filing of a charge of discrimination; or (3) assisting or participating in an investigation or proceeding brought under Title VII. Should any such retaliatory actions be taken against you, you should immediately contact the EEOC at the address or telephone number listed above.